RECREATIONAL FISHING
ALLIANCE, INC.,

      **Plaintiff,**

      v.                                          **Case No. 8:11-CV-00705-T-30AEP**

THE NATIONAL MARINE
FISHERIES SERVICE,

      **Defendant.**

_____ /

## REPORT AND RECOMMENDATION

Before the Court are the Plaintiff's Brief and Motion for Judgment on the Pleadings (the Plaintiff's "Motion for Summary Judgment," Dkt. No. 48), the Defendant National Marine Fisheries Service's (the "NMFS") Cross-Motion for Summary Judgment (the NMFS's "Motion for Summary Judgment," Dkt. No. 62), and the Plaintiff's Motion to Supplement the Record (Dkt. No. 64). In addition to these motions, the NMFS's Motion to Transfer Case (Dkt. No. 41) remains pending, which, in light of the Honorable Harvey E. Schlesinger's order transferring the case to the Tampa Division (Dkt. No. 49), is moot. For the reasons stated below, the Court recommends that the Plaintiff's Motion for Summary Judgment (Dkt. No. 48) be denied, the NMFS's Motion for Summary Judgment (Dkt. No. 62) be granted, and the Plaintiff's Motion to Supplement the Record (Dkt. No. 64) be denied as moot.

# I. FACTUAL BACKGROUND

## A.    Overview of the Magnuson Act

Through the Fishery Conservation and Management Act (later renamed the Magnuson-Stevens Fishery Conservation and Management Act), Congress delegated to the NMFS by and through the Secretary of Commerce (the "Secretary") "broad authority to manage and conserve coastal fisheries." *See generally* 16 U.S.C. § 1801 et seq. (1976) (hereafter as the "Magnuson Act"); *see also Kramer v. Mosbacher*, 878 F.2d 134, 135 (4th Cir. 1989).  Congress enacted the Magnuson Act to address, among other things, its finding that:

> Certain stocks of fish have declined to the point where their survival is threatened and other stocks of fish have been so substantially reduced in number that they could become similarly threatened as a consequence of (A) increased fishing pressure, (B) the inadequacy of fishery resource conservation and management practices and controls, or (C) direct and indirect habitat losses which have resulted in a diminished capacity to support existing fishing levels.

16 U.S.C. § 1801(a)(2).  In order to further the goal of protecting these threatened fisheries, the Magnuson Act established eight regional fishery management councils and provided that the management of fishery resources within each region shall be conducted pursuant to a fishery management plan ("FMP") prepared by each council or councils for each fish stock within its region.  16 U.S.C. § 1852.  Under the Magnuson Act, an FMP shall "contain the conservation and management measures," which are "necessary and appropriate for the conservation and management of the fishery, to prevent overfishing and rebuild overfished stocks, and to protect, restore, and promote the long-term health and stability of the fishery ...."  16 U.S.C. § 1853(1).

Pursuant to § 1851 of the Magnuson Act, "[a]ny fishery management plan prepared, and any regulation promulgated to implement any such plan ... shall be consistent with" certain national standards for fishery conservation and management. *See* 16 U.S.C. § 1851(a). For instance, National Standard 2, the subject of the Plaintiff's Motion for Summary Judgment, states that "[c]onservation and management measures shall be based upon the best scientific information available." 16 U.S.C. § 1851(a)(2). In addition, National Standard 8, also the subject of the Plaintiff's Motion for Summary Judgment, states that:

> Conservation and management measures shall, consistent with the conservation requirements of this chapter (including the prevention of overfishing and rebuilding of overfished stocks), take into account the importance of fishery resources to fishing communities by utilizing economic and social data that meet the requirements of paragraph (2), in order to (A) provide for the sustained participation of such communities, and (B) to the extent practicable, minimize adverse economic impacts on such communities.

16 U.S.C. § 1851(a)(8).

## B.  The MRFSS and MRIP

Since 1979, the NMFS has relied on the Marine Recreational Fishery Statistics Survey ("MRFSS") to obtain statistics about marine recreational fisheries for use in formulating an FMP for a given fishery. However, as concerns over the environmental impact of both recreational and commercial fishing grew, and the recreational fishing "footprint" expanded, the need for more accurate sampling programs and more precise marine recreational fishery statistics became apparent. As a result of growing criticism of the MRFSS, in 2004, the NMFS requested that the National Research Council of the National Academy of Sciences (the "NRC") conduct an independent, scientific review of the MRFSS. In April 2006, after a two-year review of the

MRFSS, the NRC published its *Review of Recreational Fisheries Survey Methods* (the "NRC Report"), making several key findings and recommendations regarding the collection and use of recreational fishing data under the MRFSS. As a result of these findings, the NRC recommended that the MRFSS be completely redesigned to improve its effectiveness. Following the lead of the NRC Report, in 2007, Congress passed and President Bush signed into law the Magnuson-Stevens Fishery Conservation and Management Reauthorization Act of 2006 (hereafter as the "MSRA"). The MSRA, among other things, mandated the completion of a program to improve the quality and accuracy of information generated by the MRFSS, with a goal of achieving acceptable accuracy and utility for each individual fishery, by January 2009. *See* 16 U.S.C. §§ 1881(g)(3)(A). Further, the MSRA directed that the improved MRFSS be implemented no later than January 1, 2009. *See* 16 U.S.C. §§ 1881(g)(4).

In October 2008, the NMFS released an implementation report (the "MRIP Implementation Plan"), outlining the steps towards replacing the MRFSS with the Marine Recreational Informational Program (the "MRIP"), an improved system of regional surveys meant to replace existing marine recreational fishing data collection programs. Pursuant to the MSRA and the MRIP Implementation Plan, on December 30, 2008, the NMFS promulgated a final rule establishing a national saltwater angler registry (the "National Registry Rule"). *See* 50 C.F.R. §§ 600.1400-1417 (2009); 73 Fed. Reg. 79705, 79705-19 (Dec. 30, 2008). The National Registry Rule definitively established a national registry of recreational anglers, "intended to improve existing angling effort surveys in order to improve their efficiency, to reduce possible sources of bias and to improve confidence in survey results by anglers and fishery managers." 73 Fed. Reg.

79705, 79705 (Dec. 30, 2008). Under the National Registry Rule, all recreational anglers were required to register with the NMFS by January 1, 2010. 73 Fed. Reg. 79705, 79706 (Dec. 30, 2008).

**C.     Amendment 17A and Regulatory Amendment 10**

On December 9, 2010, the NMFS issued a final rule to implement Amendment 17A to the FMP for the Snapper-Grouper Fishery of the South Atlantic Region, as prepared and submitted by the South Atlantic Fishery Management Council (the "Council"). *See* 75 Fed. Reg. 76874 (Dec. 9, 2010). Amendment 17A established an annual catch limit ("ACL") of zero for red snapper, thereby prohibiting all harvest and possession of red snapper in or from the South Atlantic exclusive economic zone ("EEZ"). *See id*. Amendment 17A also required that fishers use non-stainless steel circle hooks when fishing for snapper-grouper species with hook-and-line gear north of 28° N. latitude in the South Atlantic EEZ. *See id*. Lastly, Amendment 17A established a rebuilding plan for red snapper and required a monitoring program as the accountability measure for the fishery, with the intent of ending overfishing and rebuilding the stock. *See id*.

In formulating Amendment 17A, the NMFS relied chiefly on the Southeast Data, Assessment and Review ("SEDAR") process. *Id*. at 76878. SEDAR is a cooperative process initiated in 2002 to improve the quality and reliability of fishery stock assessments in the South Atlantic, Gulf of Mexico, and U.S. Caribbean. *Id*. Amendment 17A is based on SEDAR 15, a fishery assessment completed in 2008 using data collected by the MRFSS through 2006. *Id*. SEDAR 15 found that the South Atlantic red snapper stock was overfished. *Id*. The NMFS admittedly noted in their final rule to implement Amendment 17A that SEDAR 15 was

controversial with fishermen "who feel the findings contradict their experience of encountering more and larger red snapper in recent years." *Id.* Nevertheless, the NMFS found that altering its model assumptions based on the fishermen's concerns "would not change the assessment conclusions regarding the status of red snapper." *Id.*

A new red snapper SEDAR stock assessment, SEDAR 24, was completed in late October 2010, and evaluated more recent catch data than the data used in SEDAR 15. *Id.* According to the NMFS, the results of SEDAR 24 "also support the SEDAR 15 conclusion that red snapper is overfished and experiencing overfishing, although the rate of overfishing may be lower than the rate from SEDAR 15." *Id.* Due to the temporal proximity of the date of the SEDAR 24 assessment and the date of the NMFS's final rule to implement Amendment 17A, the NMFS found that "implementation cannot be further delayed based on the Magnuson-Stevens Act requirements to prepare and implement an FMP amendment to end overfishing and implement conservation and management measures to rebuild red snapper." *Id.* However, the NMFS noted that the Council would "consider the SEDAR 24 results at their December 2010 meeting, and determine whether or not a modification to the area closure is warranted. If so, adjustments to the area closure will be promulgated through a regulatory amendment." *Id.* at 76879.

On the same day that the NMFS released its final rule to implement Amendment 17A, it also released a temporary emergency rule to delay the effective date of the area closure from January 3, 2011 until June 1, 2011. *See* 75 Fed. Reg. 76890 (Dec. 9, 2010). In summarizing the emergency action, the NMFS noted that:

> A Southeast Data Assessment and Review (SEDAR) benchmark stock assessment for red snapper (SEDAR 24) was just completed on October 25, 2010, and was reviewed by the South Atlantic Fishery Management Council's (Council's) Scientific and Statistical Committee (SSC) during its

meeting from November 9-11, 2010. The new stock assessment still shows red snapper to be overfished and undergoing overfishing, however, the rate of overfishing found in SEDAR 24 is less than the rate of overfishing found in the previous stock assessment (SEDAR 15). The SSC concluded that, based on SEDAR 24, the snapper-grouper area closure approved in Amendment 17A is more conservative that what is needed to end overfishing of red snapper. Temporarily delaying the effective date of the snapper-grouper area closure specified in Amendment 17A will allow the Council time to respond to the new stock assessment information through a regulatory amendment, which will be discussed at the Council's December meeting. This emergency action is necessary to mitigate negative socioeconomic impacts associated with the snapper-grouper area closure on South Atlantic snapper-grouper fishermen and to ensure the area closure is based upon the best scientific information available.

*Id.* at 76890.

On February 18, 2011, following the Council's December 2010 meeting, the NMFS issued a proposed rule to implement a regulatory amendment ("Regulatory Amendment 10") to Amendment 17A. *See* 76 Fed. Reg. 9530 (Feb. 18, 2011). Regulatory Amendment 10 suggested the removal of the snapper-grouper area closure implemented through Amendment 17A and provided a written comment period through March 21, 2011. *Id*. at 9530. On April 28, 2011, the NMFS issued the final rule to implement Regulatory Amendment 10 to the FMP for the Snapper-Grouper Fishery of the South Atlantic Region, as prepared and submitted by the Council and effective May 31, 2011. *See* 76 Fed. Reg. 23728 (Apr. 28, 2011). The final rule, adopting Regulatory Amendment 10, removed the snapper-grouper area closure implemented through Amendment 17A. *Id*. at 23728. The Council found that, in light of the conclusions drawn from SEDAR 24, removing the snapper-grouper area closure approved in Amendment 17A "seeks to prevent significant direct economic loss to snapper-grouper fishermen without subjecting the red snapper resource to overfishing." *Id*. at 23729.

## II. PROCEDURAL BACKGROUND

**A.     The Current Case**

The Plaintiff filed the original Complaint against the NMFS on December 4, 2009 in the Jacksonville Division of the Middle District of Florida. (Dkt. No. 1.) The Plaintiff filed an Amended Complaint on January 28, 2010, and upon leave, filed the current Second Amended Complaint on December 7, 2010. (Dkt. No. 27.) The Second Amended Complaint seeks to enjoin the NMFS from implementing Amendment 17A until the NMFS properly complies with the Magnuson Act. (*Id*.) Specifically, the Plaintiff claims that the NMFS, in formulating Amendment 17A has failed to meet a number of national standards under the Magnuson Act. (*Id*.)

On April 1, 2011, the Plaintiff filed its Motion for Summary Judgment, which seeks an order from the Court setting aside Amendment 17A on the basis that: (1) the Secretary of Commerce violated the Magnuson Act by illegally delegating authority to the NMFS in approving Amendment 17A; (2) the NMFS violated National Standard 2 by ignoring the best available science and by using the MRFSS instead of the MRIP program; and (3) the NMFS violated National Standard 8 by failing to conduct an economic impact study of the area impacted by Amendment 17A. (*See* Dkt. No. 48.) On May 13, 2011, the NMFS filed its Opposition to "Plaintiff's Brief and Motion for Judgment on the Pleadings" (Dkt. No. 63) and Motion for Summary Judgment (Dkt. No. 62). In its Motion for Summary Judgment, the NMFS asserts that: (1) the Plaintiff has abandoned the claims in its Second Amended Complaint that were not raised in its Motion for Summary Judgment; (2) the Plaintiff failed to exhaust its administrative remedies by submitting comments on the proposed rule; and (3) the challenged rule should be

upheld on the merits. (*See* Dkt. No. 62.) On May 25, 2011, the Plaintiff filed a Motion to Supplement the Record (Dkt. No. 64), seeking to supplement the record with evidence to rebut the NMFS's contention that it did not submit comments on the proposed rule. Lastly, on May 27, 2011, the Plaintiff filed its Response in Opposition to the NMFS's Motion for Summary Judgment (Dkt. No. 65).

**B.      The Tampa Fish Cases**

Prior to the current case being filed, a series of similar cases involving similar parties were filed in the Tampa Division of the Middle District of Florida. These cases–*Fishing Rights Alliance v. National Marine Fisheries Service*, 8:09-CV-0916-T-30AEP; *Fishing Rights Alliance v. National Marine Fisheries Service*, 8:09-CV-1544-T-30AEP; and *Fishing Rights Alliance v. National Marine Fisheries Service*, 8:09-CV-2265-T-30AEP (collectively as the "Tampa Fish Cases")–sought to enjoin the NMFS from promulgating fishing regulations similar to the regulations in Amendment 17A, but for different fisheries in the region. The central question addressed by the Court in the Tampa Fish Cases was whether the NMFS had complied with the relevant provisions of § 1881(g) of the Magnuson Act requiring the completion and implementation of an improved MRFSS by January 1, 2009. The Court ultimately found that, by completing and implementing the MRIP, the NMFS had complied with the relevant provisions of the Magnuson Act, and judgment was entered in favor of the NMFS in the Tampa Fish Cases.

### III.  STANDARD OF REVIEW

Under the Magnuson Act, actions taken by the NMFS under regulations implementing an FMP are subject to limited judicial review as follows:

(f) Judicial review

    (1) Regulations promulgated by the Secretary under this chapter and actions described in paragraph (2) shall be subject to judicial review to the extent authorized by, and in accordance with, chapter 7 of Title 5, if a petition for such review is filed within 30 days after the date on which the regulations are promulgated or the action is published in the Federal Register, as applicable; except that–

        (A) section 705 of such Title is not applicable, and

        (B) the appropriate court shall only set aside any such regulation or action on a ground specified in section 706(2)(A), (B), (C), or (D) of such Title.

    (2) The actions referred to in paragraph (1) are actions that are taken by the Secretary under regulations which implement a fishery management plan, including but not limited to actions that establish the date of closure of a fishery to commercial or recreational fishing.

16 U.S.C. § 1855(f)(1); 5 U.S.C. § 706.  Thus, the following provisions of the Administrative Procedure Act (the "APA") summarize the Court's standard of review for the NMFS's compliance with the Magnuson Act:

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall–

(1) compel agency action unlawfully withheld or unreasonably delayed; and

(2) hold unlawful and set aside agency action, findings, and conclusions found to be–

    (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

...

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

5 U.S.C. § 706.  "A finding that a decision was arbitrary or capricious requires [the Court] to find no rational basis for the decision. Once [the Court] find[s] a rational connection between the evidence and the decision, [the Court] must defer to the agency's expertise." *Tackitt v. Prudential Ins. Co.*, 758 F.2d 1572, 1575 (11th Cir. 1985) (citations omitted); *see also Miccosukee Tribe of*

*Indians of Fla. v. United States*, 566 F.3d 1257, 1264 (11th Cir. 2009) ("The arbitrary and capricious standard is exceedingly deferential. [The Court is] not authorized to substitute [its] judgment for the agency's as long as its conclusions are rational." (quotations and citations omitted)).

## IV. DISCUSSION

### A.   The Plaintiff's Motion for Summary Judgment

### 1.   Whether the Secretary of Commerce and NOAA Violated § 1854 of the Magnuson Act

The Plaintiff first argues that the NMFS should be enjoined from implementing Amendment 17A because the Secretary of Commerce and NOAA have unlawfully delegated authority to the NMFS in violation of § 1854 of the Magnuson Act.  In support of this argument, the Plaintiff cites § 1854(a)(3) of the Magnuson Act, which requires that "[t]he *Secretary* shall approve, disapprove, or partially approve a plan or amendment within 30 days of the end of the comment period ... by written notice to the Council."  *See* 16 U.S.C. § 1854(a)(3) (emphasis added).  Based on this provision of the Magnuson Act, the Plaintiff claims that the Secretary of Commerce, and the Secretary of Commerce alone, should have approved Amendment 17A in order for it to take effect.  (Dkt. No. 48 at 2.)  According to the Plaintiff, "the Secretary of Commerce has illegally used Department Operating Order 10-15 dated April 29, 2005 (R 662) to attempt to delegate his authority under the MSRA to NOAA ...." (*Id*.)  In addition, the "NOAA has also illegally used a May 31, 1993 (R 675) Delegation of Authority to attempt to further delegate the authority to [the NMFS]." (*Id*.)  Since the Magnuson Act was reauthorized by the MSRA in January 2007, the Plaintiff argues, "both of these alleged delegations of authority predated the MSRA (2007) and Congress would have been aware of both at the time of

reauthorization." (*Id.*) Thus, since Congress did not expressly incorporate either of these delegations into the MSRA, "the plain and clear language of the MSRA gives the authority to approve an Amendment exclusively to the Secretary of Commerce." (*Id.*)

The Plaintiff's interpretation of the Magnuson Act and MSRA is improper for a number of reasons. First, when the MSRA was signed into law in 2007, it amended specific sections to further Congressional goals, but for the most part, left the foundations of the Magnuson Act in place. For instance, the MSRA explicitly amended six definitions found in the "Definitions" section of the Magnuson Act, but left the remaining forty-four definitions as they were. *Compare* Pub. L. No. 109-479, 120 Stat. 3575 (2007); *with* 16 U.S.C. § 1802. As such, the term "Secretary" is not specifically defined in the MSRA, but was defined by the Magnuson Act as "the Secretary of Commerce *or his designee*." 16 U.S.C. § 1802(39) (emphasis added). Similarly, as the Plaintiff notes in its argument, Congress did not specifically incorporate the Secretary of Commerce's previous delegations into the text of the MSRA. Since these delegations predated the MSRA and Congress did not explicitly incorporate them into the MSRA, the Plaintiff argues, they are not valid for the purposes of enforcing the MSRA. (Dkt. No. 48 at 2.) Put another way, "[t]he Secretary of Commerce is not authorized by the MSRA to delegate such authority." (*Id.*)

If the Court were to follow the Plaintiff's argument, however, even the Secretary of Commerce would not be authorized to implement the provisions of the MSRA because the MSRA does not incorporate the definition of the word "Secretary" within its text. Of course,

laws are not read in a vacuum, especially laws whose sole purpose is to *amend* an existing law.[1]

Here, the word "Secretary" has meaning because the MSRA amends the Magnuson Act, and the

Magnuson Act contains a definition of the word "Secretary." The definition of "Secretary" in the

Magnuson Act explicitly provides that the Secretary of Commerce may delegate authority.

Nevertheless, the broad power to delegate authority to act has been long established as a necessary

practice within a functioning government. *See Shreveport Engraving Co. v. U.S.*, 143 F.2d 222,

226-7 (5th Cir. 1944) ("The long and unbroken history of our government presents not a few, but

a multitude of, instances where powers, the nature of which are such that they are impossible of

personal execution, have been delegated to an office or a department. In all of those cases, the

established practice has been that the duties so delegated are performed by the many persons the

delegate has selected to perform them. The Post Office Department is a notable instance of this

kind."). Therefore, the Plaintiff's argument that the Secretary of Commerce must personally sign

off on every decision made pursuant to the MSRA is improper.

 The Plaintiff's argument also fails because, contrary to what the Plaintiff asserts, 16

U.S.C. § 1854(a)(3) was not a provision of the MSRA, enacted in 2007. Instead, 16 U.S.C. §

1854(a)(3) is a provision of the Sustainable Fisheries Act of 1996, enacted eleven years before

the MSRA, and more importantly, nine years before the Secretary of Commerce's alleged illegal

---

[1] Section 2 of the MSRA states:

 Except as otherwise expressly provided, whenever in this Act an
 amendment or repeal is expressed in terms of an amendment to, or repeal of,
 a section or other provision, the reference shall be considered to be made to
 a section or other provision of the Magnuson–Stevens Fishery Conservation
 and Management Act (16 U.S.C. 1801 et seq.).

Pub. L. No. 109-479, 120 Stat. 3575 (2007).

delegation of authority to the NOAA. The Plaintiff appears to misunderstand what exactly the MSRA accomplished, as demonstrated by the claim that "[t]he MSRA was reauthorized January 2007 ...." (Dkt. No. 48 at 2.) To the contrary, the *Magnuson Act*[2] was reauthorized by the MSRA in January 2007, meaning that the MSRA amended the Magnuson Act in 2007. Nevertheless, the very provision that the Plaintiff cites to bolster its claim that the Secretary of Commerce did not have the authority to delegate power to the NMFS was not a part of the MSRA, and thus, did not predate this explicit delegation of power. Therefore, as to the Plaintiff's argument that the NMFS did not have the authority to promulgate Amendment 17A under § 1854(a)(3) of the Magnuson Act, the Court recommends that the Plaintiff's Motion for Summary Judgment be denied.

### 2.     Whether the Challenged Rule Was Based on the Best Available Science

The Plaintiff next argues that Amendment 17A should be set aside since it was not based upon the best available science. (Dkt. No. 48 at 3.) Pursuant to § 1851 of the Magnuson Act, "[a]ny fishery management plan prepared, and any regulation promulgated to implement any such plan ... shall be consistent with" certain national standards for fishery conservation and management. *See* 16 U.S.C. § 1851(a). National Standard 2 states that "[c]onservation and management measures shall be based upon the *best scientific information available*." 16 U.S.C. § 1851(a)(2) (emphasis added). Further, the NMFS shall "establish advisory guidelines (which

---

[2] The Magnuson Act, as already defined in this Report and Recommendation, refers to the Fishery Conservation and Management Act of 1976, which was later renamed the Magnuson-Stevens Fishery Conservation and Management Act. *See generally* 16 U.S.C. § 1801 et seq. The MSRA, on the other hand, is an "[a]n Act [t]o amend the Magnuson-Stevens Fishery Conservation and Management Act to authorize activities to promote improved monitoring and compliance for high seas fisheries, or fisheries governed by international fishery management agreements, and for other purposes." Pub. L. No. 109-479, 120 Stat. 3575 (2007).

shall not have the force and effect of law), based on the national standards, to assist in the development of fishery management plans." 16 U.S.C. § 1851(b). In 1996, pursuant to § 1851 of the Magnuson Act, the NMFS adopted advisory guidelines as to FMP development under National Standard 2:

> FMPs must take into account the best scientific information available *at the time of preparation*. Between the initial drafting of an FMP and its submission for final review, new information often becomes available. This new information should be incorporated into the final FMP *where practicable*; but it is *unnecessary to start the FMP process over again*, unless the information indicates that drastic changes have occurred in the fishery that might require revision of the management objectives or measures.

50 C.F.R. § 600.315 (1996) (emphases added).

The Plaintiff argues that, since Amendment 17A was based on data collected by the MRFSS, and not the MRIP, the NMFS did use the best available science. (Dkt. No. 48 at 3.) Specifically, the Plaintiff asserts that the NMFS "has chosen to ignore the mandate of Congress and has chosen to charge blindly and recklessly forward with step 2 [updating FMPs across various fisheries] without completing step 1 [completing and implementing the MRIP] ...." (Dkt. No. 48 at 5.) Since the Court has already determined in the Tampa Fish Cases that the NMFS has properly complied with the Congressional mandate under § 1881(g)(3)(D), the Court finds that the Plaintiff's argument in this case is similarly unfounded. *See Fishing Rights Alliance, Inc. v. National Marine Fisheries Service*, Case Nos. 8:09-CV-0916-T-30AEP, 8:09-CV-1544-T-30AEP, and 8:09-CV-2265-T-30AEP, 2011 WL 3897891 (M.D. Fla. July 15, 2011), *adopted by*, *Fishing Rights Alliance, Inc. v. National Marine Fisheries Service*, Case Nos. 8:09-CV-0916-T-30AEP, 8:09-CV-1544-T-30AEP, and 8:09-CV-2265-T-30AEP, 2011 WL 3898016 (M.D. Fla.

Sep. 6, 2011). However, the NMFS has nevertheless demonstrated that Amendment 17A utilized the best available science based on data available at the time the final rule went into effect.

Amendment 17A was largely based on SEDAR 15, which was completed in 2008 and relied on data collected by the MRFSS through 2006. At the time that data for SEDAR 15 was being collected from the MRFSS, Congress recognized that the MRFSS did not represent the best possible science and passed the MSRA to improve the MRFSS. However, in 2009 and 2010, SEDAR 15 was the most recent stock assessment for the Red Snapper and data from improved surveying under the MRIP was not yet available. As the Court stated in the Tampa Fish Cases, "[n]owhere in the MSRA or its legislative history does Congress indicate its intent, as the Plaintiff argues, for the improved MRFSS to be completely finalized with all phases of the MRIP fully implemented by January 1, 2009. It is unclear if such a result will ever be realized given the 'ongoing improvements' to the MRIP." *Fishing Rights Alliance, Inc.*, 2011 WL 3897891 at * 16. Data from the improved MRFSS–the MRIP–will be realized in the future. However, the national standard set by the Magnuson Act for the NMFS does not require the use of the best science *possible*, but rather the best science *available*. At the time the NMFS promulgated Amendment 17A, the best science available was assessed in SEDAR 15. In addition, when a new stock assessment, SEDAR 24, became available shortly before the enactment of the final rule, the NMFS did not ignore this new data. Instead, it enacted Regulatory Amendment 10, which recognized flaws in the previous assessment and incorporated them by suspending the closure originally included in Amendment 17A. It is clear that the NMFS's adoption of Amendment 17A as modified by Regulatory Amendment 10 was neither "arbitrary and capricious" nor based on "a clear error of judgment." *See Sierra Club v. Johnson*, 436 F.3d 1269, 1273-4 (11th Cir.2006)

(stating that "[u]nder the arbitrary and capricious standard, we must consider whether an agency's decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.") (citations and quotations omitted).  Instead, the NMFS utilized the best data available at the time it was developing the relevant regulatory measures and supplemented these measures as new data became available.

The Plaintiff also claims that Amendment 17A is not based on the best science available because the NMFS did not incorporate the findings of Dr. Frank J. Hester in his *Independent Report on Red Snapper in SEDAR 15*.  *See* Frank J. Hester, *Independent Report on Red Snapper in SEDAR 15* (May 8, 2009) (available at http://www.southeasternfish.org/Documents/ HESTERFINALSEDAR_15_Red_Snapper_Report.pdf).  According to the Plaintiff, "Dr. Hester's report was rejected basically offhand by [the NMFS], despite the clear showing of the errors by [the NMFS]." (Dkt. No. 48 at 8.)  Regarding SEDAR 15, Dr. Hester found that "[u]ntil the early catch problem and selectivity for the recreational fishery is resolved, the assessment is incomplete and it is impossible to evaluate stock status or provide management benchmarks."  Hester, *Independent Report* at 6.

Contrary to the Plaintiff's argument, Dr. Hester's conclusions were not rejected offhand by the NMFS.  Instead, the NMFS specifically addressed Dr. Hester's findings in its December 4, 2009 temporary rule, which implemented interim measures during the development of Amendment 17A.  *See* 74 Fed. Reg. 63673 (Dec. 4, 2009).  In developing the temporary rule, the NMFS received 1,151 comments from the public, state and county agencies, and non-governmental organizations.  *Id*. at 63673.  The NMFS organized these comments into collective criticisms on certain aspects of the proposed Amendment 17A and offered public responses in

the published temporary rule. *Id.* For instance, Comment 13 "stated that the red snapper stock assessment should be redone and address the issues raised by Dr. Frank Hester including the availability of older/larger red snapper to fishing gear (selectivity)." *Id.* at 63677. In his report, Dr. Hester noted that the stock assessment model used by NMFS in SEDAR 15 included a "disproportionate number of older fish ... [resulting in a] selectivity pattern, which, for recreational catch, is flat." Hester, *Independent Report* at 5. However, upon analysis of historical data and drawing upon knowledge of the fishery, Dr. Hester argued that "catch-at-age [should] heavily favor fish younger than three years old," creating a dome-shaped selectivity pattern with a peak at a younger age. *Id.*

In its response to Comment 13, the NMFS noted that the SEDAR 15 stock assessment assumed a flat-topped selectivity for the recreational sector where red snapper become more available to fishing gear in the first few years as they grow and then remain equally available to fishing gear for the remainder of their life. 74 Fed. Reg. 63673, 63677 (Dec. 4, 2009). However, in light of Dr. Hester's criticism, the NMFS had the Southeast Fisheries Science Center (the "SEFSC") conduct three sensitivity runs for the SEDAR 15 red snapper stock assessment that included variations of dome-shaped selectivity. *Id.* The SEFSC found that:

> Under all three sensitivity runs, red snapper was overfished and experiencing overfishing; however, the magnitude of harvest reduction differed among the runs. The SEDAR 15 review workshop considered flat-topped selectivity, where all older/larger fish could be caught by fishing gear, as most likely for the commercial sector because commercial fishermen have an economic incentive to catch large fish, and the commercial sector fishes in depths and areas where the oldest and largest red snapper exist. Commercial fishermen also fish in waters deeper than where red snapper occur, suggesting that the complete depth range of red snapper is covered by this sector. Anecdotal information from reports from fishermen off the coast of northeast Florida suggests that larger red snapper tend to move inshore during June to September into depths as shallow as 60 to 90 ft (18.3 to 27.4 m), which

18

> further supports a flat-topped selectivity because larger red snapper would be available to recreational fishermen who fish close to shore. Comparison of the age structure in the commercial and recreational sectors reveals almost identical selectivity patterns, suggesting dome-shaped selectivity might not be appropriate for the recreational sector because it appears that older larger red snapper are as available to the recreational sector as for the commercial sector, for whom flat-topped selectivity seems likely.

*Id*. Thus, the Plaintiff's arguments that "Dr. Hester's report was rejected basically offhand," and that the NMFS "has redefined the term 'best available science' as 'whatever we come up with science' by using the blinders as to any criticisms of its analysis" are misguided. To the contrary, the NMFS made efforts to incorporate the latest scientific data available, as demonstrated by the implementation of Regulatory Amendment 10, and considered a wide range of critical comments, including the arguments made by Dr. Hester, in formulating Amendment 17A. Therefore, as to the Plaintiff's argument that Amendment 17A was not based on the best science available, the Court recommends that the Plaintiff's Motion for Summary Judgment be denied.

### 3.      Whether the Challenged Rule Violated National Standard 8

Lastly, the Plaintiff argues that Amendment 17A should be set aside because the NMFS "failed to do an economic impact study of the potential impact on the South Atlantic communities that will be affected by Amendment 17A and instead attempted to extrapolate a study from the Gulf of Mexico in regard to the economic impact." (Dkt. No. 48 at 9.) The Plaintiff asserts that "Amendment 17A has adversely affect [sic] coastal communities within the closure areas, NMFS [sic] failed to do the required economic impact study of the South Atlantic in violation of the MSRA." (Dkt. No. 48 at 10.) As noted earlier, National Standard 8 states that:

> Conservation and management measures shall, consistent with the conservation requirements of this chapter (including the prevention of overfishing and rebuilding of overfished stocks), take into account the importance of fishery resources to fishing communities by utilizing economic

and social data that meet the requirements of paragraph (2), in order to (A) provide for the sustained participation of such communities, and (B) to the extent practicable, minimize adverse economic impacts on such communities.

16 U.S.C. § 1851(a)(8).

As an initial matter, the Court notes that nowhere in National Standard 8 has Congress explicitly mandated that the NMFS conduct a formal economic impact study as the Plaintiff argues is "required." The Plaintiff cites to no provision of the Magnuson Act or the MSRA, no case law, or no legislative history to suggest that, in complying with National Standard 8, the NMFS may not rely on economic and social data provided by third-party publications. Nevertheless, contrary to the Plaintiff's argument, the NMFS did indeed conduct an economic impact study, which, in over four-hundred pages of analysis, addressed topics including, but not limited to, the effects on habitat environment, the effects on the biological/ecological environment, the impact on protected species, and the economic impact on commercial and recreational fisheries and fishermen. *See* South Atlantic Fishery Management Council, *Amendment 17A to the Fishery Management Plan for the Snapper Grouper Fishery of the South Atlantic Region with Final Environmental Impact Statement, Initial Regulatory Flexibility Act Analysis, Regulatory Impact Review, and Social Impact Assessment/Fishery Impact Statement* (July 2010) (available at http://sero.nmfs.noaa.gov/ sf/SGAmendment17A.htm). Contrary to the Plaintiff's unfounded argument that the NMFS extrapolated a study from the Gulf of Mexico, the final environmental impact study specifically addressed the impact of the proposed regulatory measures on coastal counties in North Carolina, South Carolina, Georgia, and Florida. *See generally id.* This final impact study was cited numerous times by the NMFS in its final rule implementing Amendment 17A, as well as in several comments and responses on Amendment

17A. *See* 75 Fed. Reg. 76874 (Dec. 9, 2010). Thus, after a review of the record, it is unclear what basis, if any, the Plaintiff has for its claim that the NMFS did not conduct an economic impact study. Finally, while the Plaintiff argues that coastal communities will be adversely affected "within the closure areas," Regulatory Amendment 10 removed the snapper-grouper area closure implemented by Amendment 17A. *See* 76 Fed. Reg. 23728 (Apr. 28, 2011). Therefore, as to the Plaintiff's argument that Amendment 17A did not comply with National Standard 8, the Court recommends that the Plaintiff's Motion for Summary Judgment be denied.

### 4.    Requested Relief

The Plaintiff argues that if Amendment 17A is found to be "null and void from the inception," the Court should reinstate Amendment 4, the last applicable amendment to the snapper grouper FMP. (Dkt. No. 48 at 10.) Amendment 4 was implemented by final rule on October 31, 1991 and set certain accountability measures and catch limits for a number of snapper and grouper species, including the red snapper. *See* 56 Fed. Reg. 56016 (Oct. 31, 1991). In the proposed rule to implement Amendment 4, the NMFS noted that "[r]ecreational total catches and catch rates for traditional snapper-grouper species such as red snapper ... have declined substantially during the 1980s, especially for the east coast of Florida." *See* 56 Fed. Reg. 29922, 29923 (July 1, 1991). In formulating Amendment 4, the NMFS relied on reports dating back to the early 1970s, and data collected by the MRFSS over the years leading up to the final rule. *See id*. In the current Motion for Summary Judgment, the Plaintiff argues that the NMFS has not used the best science available since it relied on MRFSS data collected in the 2000s. However, the Court fails to see the logic of the Plaintiff's proposed remedy, which seeks to enjoin the enforcement of Amendment 17A in favor of reverting back to Amendment 4, which was based

on data collected in the 1970s and 1980s from the very same flawed surveys that the Plaintiff is challenging. *See Fishing Rights Alliance, Inc.*, 2011 WL 3897891 at * 19 (citing *Alabama-Tombigbee Rivers Coal. v. Kempthorne*, 477 F.3d 1250, 1271 (11th Cir.2007) (comparing the proposed remedy for an alleged failure of the U.S. Fish and Wildlife Service to comply with the Endangered Species Act to "cut[ting] the cords of a skydiver's main parachute to punish the jump master for failing to pack the fellow a reserve chute.")). Granting the Plaintiff's requested relief would, without question, result in a system that is *not* based on the best science available. Therefore, the Court recommends that the Plaintiff's Motion for Summary Judgment (Dkt. No. 48) be denied.

**B.      The NMFS's Motion for Summary Judgment and Motion to Supplement the Record**

In its Motion for Summary Judgment, the NMFS raises several arguments, namely that: (1) the Plaintiff has abandoned claims not raised in its Motion for Summary Judgment; (2) the Plaintiff failed to exhaust its administrative remedies by submitting comments on the proposed rule; and (3) that the challenged regulations should be upheld on the merits. (*See* Dkt. No. 62.) With the exception of the three arguments raised by the Plaintiff in its Motion for Summary Judgment, the Plaintiff asserts in its Second Amended Complaint the following alternative claims: (1) Violation of National Standard 3 (Dkt. No. 27 at 27); (2) Violation of National Standard 4 (Dkt. No. 27 at 28); (3) Violation of National Standard 6 (Dkt. No. 27 at 30); and (4) Violation of National Standard 9 (Dkt. No. 27 at 32). The NMFS argues that these alternative claims are moot because the temporary rule has expired and is no longer in effect, and the Plaintiff's Motion for Summary Judgment omits any reference to these claims. (Dkt. No. 62 at 20.) In its Response to Defendant's Cross Motion for Summary Judgment (Dkt. No. 65), the

Plaintiff acknowledges that "the arguments in regard to National Standards 3, 4, 6 and 9 are now moot due to the [NMFS's] subsequent withdraw of the wide area 98' and 240' closures." (Dkt. No. 65 at 1.) In addition, having already determined that the three claims asserted by the Plaintiff in its Motion for Summary Judgment are improper, the Court agrees with the NMFS that the challenged regulations should be upheld on the merits. Thus, since the Plaintiff concedes that its alternative claims are moot,[3] and the Court finds that the challenged regulations should be upheld on the merits, the NMFS's second argument concerning the Plaintiff's alleged failure to exhaust its administrative remedies is also moot. Therefore, the Court recommends that the NMFS's Motion for Summary Judgment be granted. As such, the Court also recommends that the Plaintiff's Motion to Supplement the Record (Dkt. No. 64), which seeks to supplement the record with evidence to rebut the NMFS's contention in its Motion for Summary Judgment that the Plaintiff did not submit comments on the proposed rule, be denied as moot.

## V. CONCLUSION

After due consideration, the undersigned **RECOMMENDS** that the NMFS's Motion to Transfer Case (Dkt. No. 41) be **DENIED AS MOOT**, the Plaintiff's Motion for Summary Judgment (Dkt. No. 48) be **DENIED**, the NMFS's Motion for Summary Judgment (Dkt. No. 62) be **GRANTED**, and the Plaintiff's Motion to Supplement the Record (Dkt. No. 64) be **DENIED AS MOOT**.

---

[3] The Plaintiff's Second Amended Complaint also contains a paragraph entitled "Mixed Stock Exception," which argues that the establishment of the wide area 98' to 240' by Amendment 17A was improper. (Dkt. No. 27 at 35.) Since this paragraph deals with the same closure that was subsequently revoked by Regulatory Amendment 10, the mixed stock exception argument is also moot.

**IT IS SO REPORTED** at Tampa, Florida on this 24th day of February, 2012.

_____
ANTHONY E. PORCELLI
United States Magistrate Judge

## <u>NOTICE TO PARTIES</u>

Failure to file and serve written objections to the proposed findings and recommendations contained in this report within fourteen (14) days from the date it is served on the parties shall bar an aggrieved party from a _de novo_ determination by the District Court of issues covered in the report, and shall bar the party from attacking on appeal factual findings in the report accepted or adopted on appeal by the District Court except upon grounds of plain error or manifest injustice. 28 U.S.C. § 636(b)(1)(C); Local Rule 6.02; _Nettles v. Wainwright,_ 677 F.2d 404 (5th Cir. 1982) (_en banc_).

Copies furnished to:

Hon. James S. Moody, Jr.

Counsel of Record